Case No. 18-5647 CSX Transportation Inc v. City of Sebree Kentucky Argument not to exceed 15 minutes per side. Ms. Andrews, you may proceed for the appellant. Thank you, Mr. Court. My name is Jennifer Andrews, and I'm here today with Randall Redding on behalf of the appellant of the City of Sebree Kentucky. May I please reserve two minutes for rebuttal? You may. Thank you. As this Court is aware, this case at its heart involves railroad crossings in the City of Sebree Kentucky and Webster County, Kentucky. With my time today, I would like to highlight the issues that make this case and those crossings unique. The first being how Sebree is situated with respect to the CSX main line that runs directly through the center of town. As the District Court's decision now stands, CSX can raise the crossings in the City of Sebree, and there are six crossings over just about a mile span, without any limit, no limit at all on how high these crossings can be raised. This will ultimately lock down the City of Sebree with crossing and street closures. Those are really the only options that will ultimately be left for the City of Sebree. This would completely inhibit Sebree's ability to operate or function as a city at all. Sebree's already seen these things happen. We're already having to close crossings to certain types of vehicles, and CSX has suggested street closures as an alternative. There's a reference in the record, or several references, to the feathering of the road. Yes. And whether either the city or the railroad can, I guess, raise the road some as you approach the crossing, so that the peak or the hopping is not as significant. Is that something that is being explored? You didn't mention that as an option. Right. We believe that feathering is no longer an option in Sebree. It has been done in the past. In fact, under the terms of the 1979 Great Order, which I will discuss in further detail, feathering the pavement at some of those crossings was required. CSX's predecessor, L&N Railroad, was the party to that agreement at that time. The testimony in the district court from a transportation engineer is that because of Sebree's incredibly small size, it's just 1.6 square miles, there's no room to feather out anymore, to come up to a level of compliance. And let me speak briefly about that compliance to come back to that issue, just so we know how extreme the humps are at these crossings. There is no federal regulation at all, no regulation outside of Sebree's ordinance here that says how high these crossings can go. There are some guidelines that are set forth by the Railway Engineering Association. They're just guidelines. But all of the crossings, all six of the crossings in Sebree are very far out of compliance with these guidelines. And just for that point of reference, the guideline is that at a .30 feet out from the rail, there should be no more than a three inch drop in elevation. Even the main street crossing in Sebree, which I would say is the least egregious, has a nine inch drop. The westbound approach of the Mill Street crossing in Sebree has a 46 inch drop in elevation at a .30 feet out from the rail. So when we think about humped crossings that we've all seen and to some extent, we would submit that the ones in Sebree are really the worst case scenario type of crossings. Because of that, to get anywhere even close to that compliance with respect to feathering, there's just not enough room in the city of Sebree before really the streets just end to bring those up to a certain level. So it certainly seems that the railroad under the Act has a right to engage in rail type activities. And it seems that maintenance of the track is something that comes within that core element of the operations. So given what you've said, and you've said that feathering is not an option, what can the railroad do really to continue its operation? I know that the other side argues that this is preemptive and that there's an argument that it can be made, but just practically, what do they do in this instance? I think maintenance of the track would come within that core function. Absolutely, and certainly Sebree has an interest in having this line maintenance. We want the track to be in good shape as it runs through the town. There is a very clear alternative here. When you can't surface or raise the tracks further and feathering is not an option, that alternative is undercutting. There was extensive testimony about the viability of this in the lower court. Really, and just for that process, a machine comes in and in the surfacing process, I should say, a fresh ballast is put on top of old ballast and then tamed down. But the railroad says that's not really viable, don't they say that? I'm sorry? So doesn't the railroad say that that's not really viable, that that wouldn't work in this case? Well, the railroad says that undercutting is expensive. There was no finding by the district court that it was not a viable option. Really, the issue is that it's expensive, it takes a little bit longer. We have some dispute even about that. The testimony below we believe supports the position that to truly solve the foul ballast problem, and this just makes sense as a practical matter, you have to get it out. Putting fresh on top of old does not solve that foul ballast problem. To undercut it, you get that foul ballast out. You get the old ballast out, and the undercutting process does not result in any further raising of the track. So maybe you can help me with this. I think there was testimony to the fact, I know there are a couple of experts here, at least one, that undercutting would result in the tracks being less stable. That surfacing, which is what the railroad proposes, is actually the industry best practice or something to that effect. Is the record clear one way or the other on undercutting and how it fits within best practice, rail safety, things of that nature? I think it similarly dovetails probably to an efficiency and expense issue. Undercutting does not necessarily, it does not reduce stability of the track. At the end of the day, when either process is complete, the track will be stabilized to the same degree. With undercutting, it takes longer to bring that track to be re-stabilized. That was clear from the testimony below. It's a little bit of a longer process. Of course, limited to the facts in Seabury, we're talking about a very small section of rail. Even just four crossings were an issue here. CSX's position was that they would undercut the entire mile that runs through Seabury. But even with that, we're talking about a mile of track that would need to be undercut. Certainly, under either surfacing or undercutting, there's a period of re-stabilization of the track after. It does take longer to re-stabilize. Again, we believe that's an efficiency and really an expense argument. They can't run trains through quite as fast for a period of time. Those things, we don't believe, the financial expense does not support the issues of an injunction. Also, in line with this court's decision in the Blissville case, we believe those amount to increased operating costs, which do not support unreasonable interference with rail operation. Would you address the agreed order? Yes. The district court found that because the ICC Termination Act was enacted after the agreed order was entered, that the agreed order, in effect, is against public policy. Absolutely. This case is unique in the fact that this agreed order is involved here. We don't see many of these out there. Certainly, this agreed order was entered into in 1979 by CSX's predecessor, LNN. Essentially, the railroad agreed that they would allow for some limited raising in the main street crossing, which, like I said, was the least egregious of the crossings. Then, after that, there would be no further raising of the tracks. The district court just really relied on the fact that the ICCPA was not in effect at the time. I think it's important to note that the Federal Rail Safety Act, and these issues are really rail safety issues that are touching the highway here, that was in effect at the time the agreed order was entered into. The track maintenance standards that CSX talks about needing to comply with were also in effect at the time that the agreed order was entered into. Our position about the later enactment of the ICCPA, which did not come into effect until 1996,  nothing about the circumstances in Seabury have changed since that agreed order was enacted that the ICCPA should provide some sort of shield for the railroad to be able to use as a preemption argument to skirt its obligations under this agreed order. What I mean by that, particularly, is this. In 1979, when CSX entered into this agreed order, the railroad clearly knew at that time that that case involved a dispute about whether they would surface versus undercut, which is really a lot of what we have going on here. At that time, the railroad clearly knew that it would need to do some sort of track maintenance in the future. But in 1979, it believed certainly that the benefit of continuing to operate that rail line through there would outweigh the cost of having to undercut in the future. I think this is really similar to not only the Woodbridge decision from the Circus Transportation Board, but the PCS phosphate case out of the Fourth Circuit that involved relocation agreements with a mining company. There, the court said similarly that at that time, the agreements reflect the railroad's market calculation, basically thinking about an economic burden, that the benefits of operating that line would outweigh the future cost of having to relocate the rail line. Those agreements were upheld. Also, in the city of Seabreeze, and I just want to go back to this, because I feel like the situation in Seabreeze is very unique, and it cannot be underscored enough here. With the way this rail line runs directly across the center of town, there is no way across the city except through, across one of these crossings, one of the six crossings in Seabreeze. Like I said, six crossings over a really short period of time. Just one right after another, right across the center of town. This means to get to the bank, the post office, the city building, and there's a local elementary school seated right at the back there of the little town. You have to go across these crossings. Because there's no regulation at all right now, and like I said, with the way the district court's decision stands, you can just raise these ad infinitum, as long as there's no restriction at all on how far you can raise these. And I understand the situation that you have outlined, and I think all of us have gone across railroad crossings at one time or another. You had issues of some nature, but the ordinance at issue here is a pre-clearance regulation that would prevent CXC, the railroad, from performing some of its maintenance functions, right? Do you agree with that, the ordinance would? We do not believe that it would prevent them from performing track maintenance. We believe that they can do that through another method. But it would prevent them from performing it in the manner that they choose, correct? It would prevent them, the ordinance would prevent them from surfacing the track. Right, so in the manner that they desire to do it. And so the ordinance then is a pre-clearance regulation that prevents them from performing some maintenance in the way they want to do it. And if that's the case, wouldn't that be considered part of CSX's regulation? And would that therefore be preempted under the federal law? All right. I know that I'm out of time. May I answer your question? Yes, certainly. We believe that this case is different in that we don't believe that this ordinance, and particularly coupled with this agreed order, I think that really makes it unique, is not a direct regulation of CSX's rail operations. Those cases under categorical preemption really deal, and particularly permitting and preclearance, are true permitting issues, such as an environmental permit before you can even operate a rail line. We believe this situation is really more in line with the type of situation involved in this court's decision in Blissfield, where this is an incidental relation to rail transportation and not a direct regulation. Because CSX can clearly meet its obligations under the track safety standards, maintain those tracks in a perfectly viable way, we're not prohibiting them from doing that. I just want to mention, in Blissfield, which you just said this is more like Blissfield, we sent a local permitting or preclearance regulation that denies a railroad the ability to conduct some part of its operation, some part of its operation, is categorically preemptive. So I appreciate your position, but I just wanted to give you my reading on Blissfield. Thank you. Thank you. Good morning. May it please the Court, Andrew Tauber on behalf of the CSX Transportation team. If I may, I'd like to pick up where Judge Donovan ended, namely with the fact that the ordinance at issue here today is clearly a preclearance ordinance. It requires that the railroad go, apply to the city council for permission before it can conduct one of its core operations, namely the maintenance of its tracks, so that it can comply with the FRA regulations. And this is the situation, it's not a hypothetical situation. The ordinance has been used to deny CSX the ability to maintain the tracks in the way it prefers in the industry norm. So I think that's the end of the case right there. It's clearly a preclearance ordinance that has been used, not only could be used, but has been used to prevent the railroad from conducting its core operations. And under this Court's decision in Blissfield, that's the end of the story. Let's assume that's correct, and that the ordinance is preemptive. But what about the voluntary agreement? The voluntary agreement would not exist but for the ordinance. I mean, the voluntary agreement is essentially an implementation of the ordinance with respect to two of the six crossings in the city of C3, allowing the raising of one and feathering the other. That agreed order is certainly an agreed order in some sense. It's voluntary in that no one put a gun to the predecessor's head to enforce the assignment. They signed it voluntarily. But under the circumstance, A, where this ordinance was on the books and being enforced with criminal sanctions, so there was the coercive power of the city of C3 behind it, and second, in the situation where ICTA was not yet on the books. So when CSX's predecessor made the calculation of whether or not to proceed with that litigation or to resolve it, who had already lost in the court below, it did that against a very different legal background than exists today. Today, there is ICTA, and ICTA clearly has the force that we've described in our briefs. And so a railroad faced with that ordinance today would never enter into that existence. So today the railroad can do whatever it wants to destroy the ability of the citizens of C3 to get from one side of the city to the other. The railroad can maintain its tracks using servicing, which has the result of raising the crossings. There's no doubt that that is the effect of servicing. And over the years, it's gradually been increased. And it is certainly true that the city of C3 may not prohibit the railroad from doing so through a local ordinance. That is not to say, however, that the city of C3 is without recourse. The city of C3 can go to the STD, the Service Transportation Board, and petition for an order directing the railroad to lower the crossings or whatever the city believes to be appropriate. So the city is not without recourse. But the city's recourse lies with the Service Transportation Board. Has there been any success in trying to do that in the past? I'm sorry. You're asking a good question. Has there been much success? And I'm not talking about Seabreeze. But has there been much success in petitioning the Service Transportation Board?  I do not have a win-loss statistic that I can give you, Your Honor. I've certainly seen plenty of STD decisions. Sometimes they grant petitions. Sometimes they deny petitions. I'm not able to give you a win-loss record on petitions before the STD. But that would be the way the city could address the issue. And I think there's been allusions from Judge Dunlop. I think it was saying, oh, we've all countered crossings. And there was, I think, even counsel for the city said, oh, we've all countered crossings. But that's a really important casual throwaway line. So I think it goes to a part of one of the issues here, which is where the city's counsel started, namely whether or not the crossings in Seabreeze are somehow unique. And that's a legally relevant issue if one thinks that the Federal Railroad Safety Act's savings provision might come into play here. But the evidence in this case, and that's what matters here. We had an evidentiary hearing. What matters is the record evidence. And the evidence in this case is undisputed and unrebutted, which is that raised crossings are issues throughout the United States. Because every railroad has to maintain its lines. And the best way to do that is through servicing. That is the industry norm. And precisely because it's an industry norm, these crossings are not unique. And because they are not unique and is not a particularly local phenomenon, the city cannot invoke the FRSA's savings clause as a way of evading preemption either under the FRSA or under DICTA. And so counsel's assertions about the uniqueness simply do not carry any weight when we have an evidentiary record. And this court has to decide on the evidentiary record. Let me make sure I'm clear. What's your reasoning that the city cannot invoke the savings clause? Well, the savings clause, the FRSA's savings clause, would save an otherwise preempted law from preemption if the three prongs of the savings clause are met. The first prong, which is what we're talking about here, is the requirement to avoid preemption that the state law at issue, the local ordinance at issue, be A, necessary to B, reduce or eliminate an essentially local hazard. So there are two pieces of that first prong. One, there has to be an essentially local hazard. And we're having this discussion right now whether or not that is the case. We certainly submit that it is not. The evidence of this case shows that the conditions that Seabury is pointing to are conditions that are found in many municipalities throughout the country. So that's the first argument there. The second thing is, even if one were to accept the unsupported assertion that the crossings in Seabury are somehow unique, the city would still have to show, in order to evade preemption, that the ordinance they've made necessary to ameliorate that condition. But here, the evidence, again, the evidence from the hearing is that feathering is still a viable option. The city's own expert, Mr. Clark, testified and pointed the court to the testimony in our briefs, testified that feathering is an option. He says there are some difficulties because of the side streets, but it is an option. And so the city fails to satisfy even the first prong of the savings clause. So they cannot show uniquely local hazard, nor can they show that their response to that perceived hazard is necessary for its amelioration. Did the district court engage in an analysis of the Federal Rail Safety Act? No, Your Honor. And it only discussed the ICC termination? That's correct, Your Honor. The court only reached the argument, even though we consistently were pushing the FRSA argument. Thank you. I certainly wouldn't want to criticize the district court for having so done. We've seen cases from this court and other circuits which finds that a state law is preempted under one or the other of the statutes. It says, well, that's good enough. The law has to fall. We're not going to go hand in hand. I guess my question, sorry to interrupt, is maybe there's a reason to remand the district court to give it an opportunity to conduct an analysis under the Federal Rail Safety Act. I don't think a remand is at all necessary, Your Honor, because the question for preemption under the FRSA is whether the state law at issue regulates a subject matter that is covered by federal regulations. And we know from the record what the ordinance here regulates. It regulates the maintenance of CSX's rail track. And we know that the FRA has issued numerous regulations governing the maintenance of rail track. Indeed, it's issued regulations with incredibly narrow specifications or standards governing track geometry, the changes in elevation of the track, track alignment of those left to right. And all of those things are directly implicated by the method in which one of the tracks in the city of Seabury is trying to regulate the manner in which CSX maintains its tracks so as to comply with federal track safety standards. So we have, on the one hand, a municipal ordinance regulating the maintenance of track geometry and track structure. And on the other hand, we have federal regulations issued by the FRA regulating the maintenance of track structure and track geometry. And so on the record, already built in the court just as a legal matter, we see that the precondition for FRSA preemption is satisfied here. So I don't think remand is necessary. Is there any limit to how high you could raise the tracks? There is no federal regulation that specifically speaks to the height of the tracks directly. So the answer, in short, is no, Your Honor. But again, it's an issue throughout the country which lends itself to petitions to the STB, which are obviously interested in rail conditions throughout the country. And we would encourage the city, if it is not willing to enter into the compromise that we've repeatedly offered to it, to go to the STB. What we have offered to the city is to help it financially, to feather two of the crossings, and to close some of the most egregious ones which cannot be saved, as the city emphasizes the very, very small jurisdiction we're talking about, I think, a mile from one end to the other. And five of the six crossings are all squeezed into about a 0.2 mile, 0.3 mile stretch. So if you happen to close one street, it's not as if you have to drive 10 miles down the river to cross a bridge. You just drive a block away, and then you can cross. So it's really not nearly as dramatic a situation as the city is trying to portray. Your Honor, if I may, we were talking briefly about categorical preemption under ICTA, and why we believe this is, without any doubt, a preclearance ordinance that falls for that very reason. But even if this court were to engage in an as-applied analysis under ICTA, rather than a categorical analysis, we believe that this ordinance fails the status, is preempted under ICTA, even on an as-applied analysis. The evidence from the trial court is clear. Undercutting disrupts railroad operations to a far greater degree than does surfacing. The evidence, again, the evidence, not the assertions of counsel, but the evidence in the record show that it would take CSX one day to surface the tracks, but five weeks to undercut the tracks. The evidence shows that the length of time that the tracks need to re-stabilize after surfacing is approximately one to two days. The length of time needed for re-stabilization after undercutting is many months. And it's not just a little bit of time, not a little bit of efficiency, but the essence of CSX's business, the essence of freight railroads, is to transport freight. If you have to shut down your rail line for five weeks, you're not conducting rail operations. It's not just a minor inconvenience, not just a matter of a little bit of expense, it's going to the heart of what the railroad is to do. It goes to the heart of what STB has authorized the railroad to do. It's not just a matter of cost, it's a matter of interfering with rail operations. And so, under even as applied analysis, this ordinance would fail as well. I thought you seemed puzzled by what I'm saying. Is there? No. Sorry. No, no, no, no. I just want to make sure I'm answering the questions. I don't have a poker player. I understand. Let me just touch on a couple of things that counsel said, Your Honor. She says, and I think I'm quoting here, I'm certainly paraphrasing, I'm not actually quoting, that nothing in Seabury has changed since 1979. That was counsel's justification for continuing to enforce the agreed order. Well, if nothing has changed since 1979, then feathering is plainly a viable option since the agreed order, as counsel acknowledges in paragraph D, calls for the feathering of certain crossings. They can't feather both ways. They can't say on the one hand, nothing has changed, and therefore you have to continue undercutting, but oh, something has changed, and therefore you can't feather. But she did say that the grade has been, over that period of time, constantly increasing. I think I heard nine inches somewhere, and I heard 40-something someplace, Yeah, but we're not understanding. We don't know what the base was in 1979. It's not that it went from zero to 48 in that period of time. It's only gone up a few inches in that period. I think we all disagree on how much has gone up, but carry on. Again, the evidence in this case is clear and unrebutted that there have been technological changes since the entry of the agreed order that render undercutting no longer a feasible option, even if it was at the time. The unrebutted evidence shows that trains today, in contrast to 1979, are heavier. They travel at greater speeds, and they move on continuously welded rail, as opposed to jointed rail, which had the norm back then. The evidence shows, unrebutted, undisputed, that these technological changes since 1979 mean that undercutting is far less viable than it might have been at the time, and that servicing is indeed the way to go forward, and it is the industry norm. The evidence also shows, as I recall, that there are vehicles, especially those with the long wheelbase, buses, trucks, that are having some difficulty. Correct? Getting over the peak and getting stuck. Dixon fatalities. I'm not aware of any fatalities. The one accident they point to was a no-injury accident. A truck got hit. It was an accident. It was at Dixon Street. It's worth noting, Your Honor, that at that crossing, there is a no-trucks sign posted for precisely this reason. The truck driver simply ignored that sign. So, you mentioned before that the railroad has offered to help the city pay for some of the feathering. Yes. If they would close some of the crossing. So, I know you said it's only about a mile, but the ones that are the steepest grade, are those the ones you go over trying to close? Yes. Okay. Thanks. Thank you, Your Honor. Thank you. I briefly want to readdress the issue of feathering again, because that's kind of a lot. In addition to the small space in Seabury and the inability to feather out because the crossing is already so steep, one point is that there are very close side streets. Spring Street runs directly parallel to the rail line, and it's probably from mid-view away from the rail line. So, the testimony below was that if we feather, that entire side street would have to be raised, and we would just keep going more and more from there. So, either Seabury has to somehow feather and raise all of its other streets to come up to this level, or it has to start closing things, and those are not options for us. It's not just closing some of them, not an option. If there are only, if the five of them are within an hour, an hour and a half length. Largely because there's no regulation on how high these crossings can go. So, if we close two now, and all of these are very steep. I mean, we're very close. So, the two most egregious, the next two are not far behind that. So, if they come through another, do another line of surfacing, then do we have to close those also? Because there are no ways across the city except across these tracks. So, as they keep raising them, if we have to keep closing crossings, there'll be no way to get in and out, and that's a problem for emergency vehicles, at the school, and those school buses and semi trucks, all of those things are already having problems, and we've already had to close some of the crossings to them. And just for my information, has Seabury applied to the Surface Transportation Board for relief? Seabury has not. And then, just briefly again, I just want to say that circumstances in Seabury are unique, and we believe this court can reverse the district's court's decision without creating a widespread change in preemption law here. Seabury's situation is unique in these facts that give rise to this ordinance, and coupled with this agreed order, which makes that incredibly unique, that was voluntarily entered into by CSF's predecessor. So on those limited facts, and in light of the unique circumstances involving that order, we would ask that this court reverse the district court's judgment and relieve Seabury of the permanent injunction. Okay, thank you, counsel. There was reference to an argument to some sort of settlement discussions, or at least an offer. And I guess I'm just curious as to whether parties have engaged our mediation office in terms of continuing any discussions and whether you might benefit from that. You don't have to answer it right now, but we do have what I would be an excellent mediation office headed by a gentleman named Paul Calico. He's got a seasoned staff there, very much experienced with dealing with matters of this general nature. So I don't know if there's benefit or not in undertaking or continuing discussions. But I thought I would mention that. Have you had discussions yet with the mediation office? We have, your honor. I think largely Seabury at this point feels like it's out of options, and a lot of what's been offered is what we discussed in just closing process. I don't need to know the details. I just thought I would mention that. And if there's a benefit to continuing those discussions, I would certainly encourage you to do that. The court's not involved in any aspect of those discussions in their confidential in terms of our process. So do it if you wish, and if you think you've reached the end of any productivity, then so be it. Okay, the case will be submitted, and we thank you very much for your...